T.C. Memo. 1997-532


UNITED STATES TAX COURT


DENNIS C. GANDY, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

DENNIS C. GANDY AND CAROLYN S. GANDY, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 26018-93, 26028-93.      Filed December 1, 1997.


William A. Roberts and Jeffrey C. Adams, for petitioners.

Shelley D. Turner and Audrey M. Morris, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


COHEN, Chief Judge:[1] Respondent determined deficiencies in

Federal income tax and additions to tax for petitioners Dennis C.

and Carolyn S. Gandy as follows:

_____

[1] These consolidated cases were tried before Judge Edna G.
Parker. Judge Parker died after completion of the trial. The
parties were afforded an opportunity for a new trial, in whole or
in part, but they consented to disposition of the cases on the
record of the trial before Judge Parker.

| Year | Deficiency | Additions to Tax | |
|------|-----------|------------------|------------------|
| | | Sec. 6653(b) | Sec. 6661 |
| 1985 | $163,221 | [1]$ 81,611 | $40,805 |
| 1986 | 240,868 | [1]180,651 | 60,217 |
| 1987 | 39,636 | [1]29,727 | 9,909 |

[1] Plus 50 percent of the interest due on the deficiency. In the alternative to the additions to tax for fraud, respondent determined additions to tax for negligence and, for 1987, an addition to tax for delinquency.

Respondent determined deficiencies in Federal income tax, additions to tax, and a fraud penalty for petitioner Dennis C. Gandy as follows:

| Year | Deficiency | Additions to Tax | | Penalty |
|------|-----------|------------------|-----------|-----------|
| | | Sec. 6653(b) | Sec. 6661 | Sec. 6663 |
| 1988 | $ 22,393 | $16,795 | $5,598 | --- |
| 1989 | 112,205 | --- | --- | $84,154 |

In the alternative to the fraud addition to tax and penalty, respondent determined a negligence addition to tax for 1988 and an accuracy-related penalty under section 6662(a) for 1989. By amendment to answer, respondent sought revised deficiencies in income tax, additions to tax, and fraud penalty for petitioner Dennis C. Gandy as follows:

| Year | Deficiency | Additions to Tax | | Penalty |
|------|-----------|------------------|-----------|-----------|
| | | Sec. 6653(b) | Sec. 6661 | Sec. 6663 |
| 1988 | $27,201 | $20,401 | $6,800 | --- |
| 1989 | 48,149 | --- | --- | $36,112 |

Respondent reasserted a negligence addition to tax and penalty in the alternative to fraud.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issues to be decided in these cases are as follows:

(1) Whether the statute of limitations precludes assessment and collection for any of the taxable years 1985 through 1989;

(2) whether Dennis C. Gandy and Carolyn S. Gandy (petitioners) received unreported Schedule F income from Dennis Gandy Nursery (the nursery) for 1985 through 1987;

(3) whether Dennis C. Gandy (Mr. Gandy) received unreported Schedule F income from the nursery for 1988 and 1989;

(4) whether petitioners received unreported interest income for 1985 and 1986 and overreported such income for 1987;

(5) whether petitioners failed to report capital gain income for 1987;

(6) whether petitioners are entitled to a net operating loss deduction for 1985;

(7) whether petitioners are liable for the additions to tax for fraud or for negligence for 1985 through 1987;

(8) whether Mr. Gandy is liable for the addition to tax for fraud or for negligence for 1988 and for the fraud or negligence penalty for 1989;

(9) whether petitioners are liable for an addition to tax for delinquency for 1987;

(10) whether petitioners are liable for the additions to tax under section 6661 for 1985 through 1987; and

(11) whether Mr. Gandy is liable for an addition to tax under section 6661 for 1988.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners resided in Ben Wheeler, Texas, at the time they filed their petitions in these cases. During 1985 through 1989, petitioners were residents of Van Zandt County, Texas.

Petitioners were married on August 14, 1970. Carolyn S. Gandy (Mrs. Gandy) attended high school and completed the 10th grade prior to marrying Mr. Gandy. Mr. Gandy received a bachelor's degree in management in 1971 from the University of Texas at Austin. Petitioners were divorced on June 14, 1988. Mrs. Gandy moved back into the marital residence in 1991; however, petitioners remain divorced.

Burnice Gandy is Mr. Gandy's father. In 1947, Burnice Gandy received a disability discharge from the military. From that time, Burnice Gandy's income consisted almost exclusively of military disability and Social Security benefits.

### The Nursery

Petitioners established the nursery in 1972. The nursery property is located 5 miles south of Van, Texas. Petitioners'

residence is located on the nursery property.  During 1985 through 1987, petitioners owned and operated the nursery as a sole proprietorship.  During 1988 and 1989, Mr. Gandy owned and operated the nursery as a sole proprietorship.  Petitioners were cash basis taxpayers.

During the years in issue, the nursery sold trees and plants throughout the southwestern United States.  The nursery grew approximately 70 to 90 percent of its products.  Some trees were grown in the field and, when large enough for the customers' needs, were dug up by hand, or, if very large, by machinery; the dirt-covered roots of the tree then were covered with burlap and wire mesh.  This method of growing trees is known as ball and burlap (B&B).  The B&B trees generally were sold to landscapers or construction companies.

During 1985, approximately 75 percent of the nursery's production was in B&B trees; by 1989, 95 percent was in "container" trees.  In the container method, a tree is planted and grown in the container in which it will be sold to its ultimate purchaser.  The nursery sold many of its container trees to chain stores for resale.  During the years in issue, Army-Air Force, Wal-Mart, K-Mart, and Sears Roebuck & Co. were the major clients of the nursery.

The nursery grew much of its stock from small seedlings. The nursery had approximately 200 greenhouses and covered about 450 acres.  The nursery would grow seedlings for a year in the

"seedhouse" and then transplant them into the desired containers, usually 2-gallon or 5-gallon containers. Those containers were moved from the seedhouse to pads where they could be spaced, pruned, and staked. The 5-gallon container trees generally were spaced two or three times per year as they grew. The nursery would water the container trees on the pads an average of about twice per day. The container trees in the field operation would receive water and be fertilized four times a day. At each stage, some of the plants would be culled. All aspects of this operation were done by hand. The B&B trees that were planted in the fields were also pruned and fertilized by hand.

The nursery hired Mexican laborers to dig up B&B trees on a piecework basis. For a portion of the earliest years in issue, petitioners used cash to pay the Mexican pieceworkers. Beginning in mid-1987, the workers were paid by check. The nursery had a pulling crew that moved the trees from the field to the loading dock in order to fill an order. The pulling crew placed by hand a name tag and a price tag on each of the container trees.

Generally, each year the nursery began shipping in late December or early January and continued until June or July of the following year. The nursery owned its delivery trucks and employed the drivers. The nursery had a loading crew to load the trucks. The nursery delivered the container trees to its chain store customers using 45- to 48-foot semitrucks. Approximately 1,500 5-gallon container trees or 3,000 2-gallon container trees

or 6,000 1-gallon container trees could fit on one truck. The nursery infrequently shipped B&B trees.

The nursery gave its truck drivers cash advances, generally in amounts of $300 to $500, to pay for travel expenses. The drivers were required to bring back receipts. If the total amount of a driver's receipts was less than the amount of the advance, the difference was deducted from the driver's paycheck. At some point, the nursery changed to a system whereby the drivers used credit or checks, rather than cash, to pay for fuel.

During harvest and shipping time, the nursery employed almost twice as many field workers as during growing time. During the years in issue, the nursery employed 35 to 40 field workers during growing time and 75 to 100 during shipping time. Counting turnover, as many as 150 workers might be employed during a year.

Approximately 90 percent of the nursery's seasonal labor force came from Mexico. During the earlier years in issue, laborers were transported from Mexico by persons known as "coyotes" who charged $500 to $1,000 per laborer. The nursery advanced the Mexican laborers the coyote payments in cash and then deducted payments from their paychecks. Some laborers would leave before all of the advance had been recovered.

Some of the Mexican laborers lived on the nursery property in a concrete bunkhouse type facility. Petitioners deducted a

small amount per week from the paychecks of these men as a charge for housing.

Every year, Mr. Gandy and some of his employees would travel to Tennessee and dig up trees for up to a month. They would camp out when on these trips. They would dig up trees for B&B and for "bareroot" trees. "Bareroot" is a method of preparing trees for immediate sale. The trees are dug up, then the dirt around the roots is removed, and the trees are replanted into containers with fresh soil. Mr. Gandy used cash when he traveled to Tennessee, purchasing sleeping bags, blankets, and other camping supplies.

Office Practices

For the first 10 years of the nursery's operation, petitioners ran the sales and billing activities out of their residence. At first, Mrs. Gandy prepared invoices and shipping documents by hand; after a while, she bought and used a typewriter. In approximately 1982, petitioners built a small office building. At that time, the office building had three rooms: a kitchen and tag room (where the picture tags and bands that would be attached to the trees were stored and organized), an office for Mr. Gandy, and an office and reception area for Mrs. Gandy. In approximately 1984, they expanded the office building, adding three more rooms. With the addition of these rooms, the building had an office for the use of the nursery's

salesmen, a separate reception area, and a larger tag room; the former kitchen/tag room was made into a break room.

In approximately 1984, petitioners bought a Tandy computer for the nursery. Due to the computer's limited capabilities, petitioners decided to use it only for billing the nursery's more detailed and frequent accounts, generally those of the chain store customers. Petitioners continued the use of the previous invoice system for the remaining customers; these orders were not recorded on the computer. The two types of invoices had separate numbering sequences. Mrs. Gandy established two ledgers, one for each type of invoice. In 1985, petitioners bought an IBM computer with a new accounting software package.

During 1985 through a portion of 1987, Mrs. Gandy worked in the business office of the nursery on a daily basis. She was in charge of the office and trained the employees who worked there. Sometime during 1987, Mrs. Gandy quit working in the office. Ann Dozier (Dozier) became the office manager after Mrs. Gandy left. Mr. Gandy spent very little time in the office, spending most of his time in the field. Many of the office employees were either friends or relatives of petitioners or of each other.

During the years in issue, petitioners maintained a business bank account at the First State Bank of Van styled "Dennis Gandy Nursery" (account No. 01-0118-8), which was the business bank account for the nursery. During 1989, Mr. Gandy maintained a business bank account at the First National Bank of Canton styled

"Dennis Gandy Nursery" (account No. 21-5232-0).  This latter account was opened on December 29, 1988.  Thereafter, this new account was used as the business account for the nursery.  All references to the nursery bank account refer to the business bank account in use as of the date discussed.

During the years in issue, the nursery had office procedures that generally were followed by petitioners and nursery employees.  Various nursery office employees would assist the walk-in customers and write up invoices.  The chain store invoices were generated from the computer.  Petitioners continued to maintain the two sets of ledgers.  During 1985 through 1989, petitioners maintained one set of ledgers to record receipts from the nursery that generally were not deposited into the nursery bank account.  That set consisted of the ledgers that listed the handwritten or typed invoices; those ledgers were referred to by the nursery employees as the cash book or cash ledger or the walk-in book or walk-in ledger (the walk-in ledger).  Petitioners maintained a second set of ledgers to record receipts from the nursery that generally were deposited into the nursery bank account.  This second set of ledgers contained listings of the computer-generated invoices; employees referred to these ledgers as the deposits ledger or deposits book or the chain store book or the chain store ledger (the chain store ledger).

During 1985 through 1989, the nursery sales invoices were marked with a "P" when they were first posted to the appropriate

ledger. The nursery sales invoices were marked with a second "P" ("PP") when the amount due was paid by the customer. Those sales invoices that were marked with a "PP", but were not dated, were those sales that were generally paid by the customer on the date of the invoice. The walk-in invoices and the chain store invoices were kept in different file drawers. The receptionist would post the walk-in invoices to the walk-in ledger. The walk-in ledger was kept in the receptionist's desk, along with any checks or cash collected. Those two or three employees who usually worked with the computer posted the chain store invoices to the chain store ledger. The chain store ledger was kept in the computer room or in one of the offices.

Generally, each day, one of the nursery's employees, usually the receptionist, would go to the bank. Certain of the checks taken to the bank were cashed. Mrs. Gandy generally determined which checks would be cashed and which would be deposited. The checks that were cashed generally came from B&B customers or from those customers who made infrequent purchases, i.e., those listed in the walk-in ledger, not from the chain store customers. The receptionist was instructed by Mrs. Gandy to limit the checks cashed to an amount less than $10,000. The purpose of the instructions was to avoid reports of currency transactions to the Internal Revenue Service (IRS). No deposits of currency were made into the nursery bank account during the years in issue.

Cash receipts or cash from the negotiation of checks was turned over to petitioners. Cash was kept in the receptionist's desk drawer; if a large amount accumulated, Mr. Gandy put it in the safe at petitioners' residence. At the end of the day, any cash remaining in the drawer would be given to petitioners. Mrs. Gandy sometimes used cash from the drawer to buy groceries, putting in a receipt in order to account for the day's transactions to Mr. Gandy each night. The office did not have a safe or alarm system. Money that was put into the safe at petitioners' residence was not returned to the office. Sometimes, Mr. Gandy would make cash payments to the laborers from the money at the residence.

Some of petitioners' household bills were paid from the nursery bank account. When paying utility bills that included both the nursery and their residence, Mrs. Gandy would indicate in the nursery checkbook what amount was for their residence. Petitioners wrote a check from the nursery bank account to themselves every few weeks and deposited it into their personal checking account for living expenses; the amounts of those checks usually were $1,000, $1,500, or $2,000. During 1985 through 1987, the total amounts that petitioners withdrew from the nursery bank account for deposit into their personal checking account were:

| Year | Amount |
|------|--------|
| 1985 | $6,500 |
| 1986 | 15,000 |
| 1987 | 6,500 |

In February 1986, petitioners engaged John E. Shinn (Shinn), a certified public accountant, to prepare the nursery's financial statements and petitioners' 1985 income tax return. Mr. Gandy asked Shinn to assist them in procuring more appropriate software to manage their accounting and inventory functions. Shinn spent a month or two at the nursery office while analyzing the nursery's needs. As a result, petitioners purchased new computer software that would track inventory as well as maintain the nursery's books and records. This new system was installed during mid-1987, and the vendor provided training to the nursery employees.

Loans to Petitioners

Small Business Administration

Petitioners received loans from the Small Business Administration (SBA). The first loan was in the amount of $200,000 after a severe drought in approximately 1980 to 1981. The second loan was for $500,000 in 1983 to 1984, after severe winter weather damaged the crops. The purpose of the SBA loans was to enable petitioners to restart their nursery after these disasters. Petitioners placed the funds from these SBA loans into certificates of deposit (CD's). During 1985 and 1986, petitioners made the following payments on the SBA loans:

| Date | Amount |
|------|--------|
| Apr. 5, 1985 | $22,600 |
| Sept. 21, 1985 | 44,975 |
| Mar. 25, 1986 | 22,600 |
| Oct. 21, 1986 | 44,975 |

Production Credit Association

Production Credit Association (PCA) is a lending institution that makes loans to farmers and ranchers. Petitioners began borrowing from PCA in about 1979 and borrowed throughout the years in issue. Generally, the activity on the PCA loans was seasonal; petitioners received disbursements from PCA beginning in the late summer through fall and early winter and made payments in the spring of the year. The PCA loans had maturity dates of 1 year or less, but any unpaid balance at the maturity date would be renewed with a new maturity date. Disbursements of PCA loans to petitioners during the specified years totaled:

| Year | Amount |
|------|--------|
| 1985 | $505,000 |
| 1986 | 260,000 |
| 1987 | 203,700 |

Petitioners made payments on the PCA loans during these same years by checks drawn on the nursery bank account.

Prior to petitioners' receiving the SBA loans, PCA held as collateral the equipment and nursery stock inventory and some real estate. The SBA took a blanket lien with first priority on petitioners' assets, moving PCA to a secondary position. Thereafter, petitioners used the CD's that were funded with the

SBA loan proceeds as collateral for the loans from PCA and from other lenders.

On December 18, 1986, Mr. Gandy borrowed $90,000 from Sunbelt Savings (then Independent American Savings). The proceeds of this loan were used as a payment on the PCA loans. On April 16, 1987, at the request of PCA, petitioners redeemed the CD's that were being used for collateral in order to reduce the balance outstanding on their PCA loan; they made a payment of $356,835.83 on that balance. At the same time, petitioners repaid the December 18, 1986, loan for $90,000 from Sunbelt Savings with funds from one of the redeemed CD's.

Other Loans

On January 15, 1986, Mr. Gandy borrowed $21,000 from the First State Bank of Van. This money was deposited in the nursery bank account. Petitioners repaid this loan with funds from the nursery bank account on February 18, 1986.

On March 10, 1986, Mrs. Gandy borrowed $1,500 from the First State Bank of Van, the proceeds of which went to Vernon Sexton. This loan was repaid in approximately monthly payments from a bank account at Sunbelt Savings styled Carolyn Gandy, Trust for Vernon Sexton, Jr.

On August 1, 1986, Mr. Gandy borrowed $90,000 from Sunbelt Savings. Petitioners used the proceeds to fund a portion of a mortgage loan that they made to Todd Fowler (Fowler), as discussed below.

On September 30, 1986, petitioners borrowed $24,836.21 from Paccar Financial Corporation to purchase a piece of equipment. Petitioners completed repayment of this loan by January 17, 1988, making payments from the nursery bank account.

On October 10, 1986, petitioners borrowed $35,000 from the First State Bank of Van. Petitioners deposited this money into the nursery bank account. They repaid the loan on March 4, 1987, from the nursery bank account.

During the fall of 1987, Mrs. Gandy d/b/a the Gandy Travel Agency borrowed a total of $8,300 from First National Bank of Canton.

Loans Made by Petitioners

In 1985, petitioners began lending money to individuals, generally for the purchase or construction of personal residences, residential rental properties, or commercial buildings. During 1985 through 1987, petitioners made loans totaling at least:

| Year | Amount |
|------|--------|
| 1985 | $139,222.62 |
| 1986 | 371,546.98 |
| 1987 | 209,918.13 |
|      | $720,687.73 |

Petitioners used funds from the nursery receipts to make many of the mortgage loans; on one occasion, petitioners borrowed $90,000 as partial funding for a $118,500 loan to Fowler. As petitioners began receiving payments from the early borrowers, they used some of these funds to make new loans. The mortgage loan payments

that petitioners received from the borrowers were in the form of checks. During 1985 through 1987, petitioners received payments totaling at least:

| Year | Amount |
|------|--------|
| 1985 | $ 624.10 |
| 1986 | 40,306.17 |
| 1987 | 152,480.13 |
|      | $193,410.40 |

For some of the loans, documents were drawn up and settlement conducted by an attorney or a title company. Petitioners provided the borrowers with repayment schedules indicating the amounts of principal and interest within each payment.

In about early 1986, Mr. Gandy approached Cary Murray (Murray), then president of the First State Bank of Van, and told him that he had approximately $800,000 that he wanted to invest in real estate loans. Murray and his partner Roy Carty received a loan from petitioners in the amount of $30,000 on June 24, 1986. Closing was conducted by a title company. Murray received a second loan in the amount of $25,000 on October 10, 1986. Closing was conducted by the same title company. Each time, Mrs. Gandy brought the funds in cash to the title company, which in turn gave the borrowers cashier's checks. Murray made payments on these loans by checks made out to "Dennis Gandy", beginning approximately 1 month after receipt of the loan proceeds. Petitioners gave Murray a form each year stating the amount of interest he had paid.

Some of the closings were handled by attorney Dean White (White).  White made the following deposits of funds that were received from petitioners for the purpose of making loans:

| Date | Check | Cash | Borrower |
|------|-------|------|----------|
| Aug. 1, 1986 | $90,000.00 | $28,000.00 | Fowler |
| May 15, 1987 | | 34,000.00 | Tankersley |
| July 10, 1987 | 9,118.13 | 9,000.00 | Magnusons |
| Sept. 24, 1987 | 10,000.00 | 8,500.00 | Spradlin |

In many instances, petitioners disbursed the funds directly to the borrowers, sometimes by check, sometimes in cash.  On August 8, 1986, petitioners disbursed $41,000 in wrapped $100 bills to James E. Carter, Mr. Gandy's first cousin, and Sandra L. Carter at petitioners' kitchen table.  Petitioners lent the Carters an additional $30,000, with draws beginning in November 1986.  The first such draw, in the amount of $5,000 on November 14, 1986, was by check.  For the subsequent draws, Mrs. Gandy delivered cash to the Carters' business and wrote receipts for Sandra L. Carter to sign.  A second note was drawn up on March 20, 1987, after the additional money was advanced to the Carters.  These loans to the Carters were recorded in the county records.

Terry and Rhonda Wilson borrowed $50,000 from petitioners to pay for the house the Wilsons were building.  Closing occurred on August 21, 1987.  The Wilsons received the funds in draws beginning in about May 1987 as the funds were needed for construction.  Two draws, one on May 15, 1987, and another on May 28, 1987, each for $6,000, were in the form of checks.

Mrs. Gandy disbursed most of the other funds in cash, in bundles of $100 bills, at petitioners' residence.

Bank Accounts

During 1986, petitioners maintained two personal bank accounts at the First State Bank of Ben Wheeler styled "Carolyn or Dennis Gandy" (account No. 80-0255-0 and account No. 29-8816-0). During the 10 days in March 1986 that account No. 29-8816-0 was open, petitioners deposited two checks from mortgage borrowers and one nursery check in the amount of $13,871.25; they closed the account and transferred the balance to open account No. 80-0255-0. During the approximately 4-month period during 1986 that petitioners used account No. 80-0255-0, they deposited a total of $428,285.42, including the transfer of $15,052.60 from account No. 29-8816-0, proceeds of 13 checks from mortgage borrowers, two nursery checks, and five deposits of currency, the largest of which was $10,000; they distributed the majority of the funds to mortgage borrowers.

During some portion of the years in issue, petitioners maintained the following personal bank accounts:

| Account Name | Account No. |
|---|---|
| Sunbelt Savings | |
| Carolyn Gandy | 03-1006594 |
| Carolyn Gandy, Trust for Vernon Sexton, Jr. | 03-10012208 |
| First State Bank of Van | |
| The Carolyn Gandy Irrevocable Trust, Dennis Gandy, Trustee | 01-0892-8 |
| Dennis or Carolyn Gandy | 10-5933-6 |
| First National Bank of Canton | |
| Dennis or Carolyn Gandy | 12-6064-5 |
| Carolyn Gandy | 12-6133-8 |

Mrs. Gandy used account No. 03-1006594 at Sunbelt Savings as a personal checking account for the Gandy family until early September 1987. She deposited checks that were written to herself from the nursery bank account into this account. Mrs. Gandy opened account No. 12-6133-8 at First National Bank of Canton in September 1987. This latter account was used primarily to pay for personal expenses.

Account No. 01-0892-8 at First State Bank of Van was opened with a deposit of a check for $19,500 payable to Mrs. Gandy from the nursery bank account. The funds in this account were used to make a payment in the amount of $19,308.20 to Executive Life Insurance Co. on September 11, 1987.

The funds of account No. 10-5933-6 at First State Bank of Van were used to pay monthly drafts for life insurance premiums.

With the exception of one check to the nursery in the amount of $7,667.99 that was paid on September 14, 1987, nearly all of the funds paid from this account went for the insurance premiums or bank charges. Previously, both insurance companies were paid from the nursery bank account. During 1986, petitioners deposited a total of $13,000 from the nursery bank account into this account. During 1987, petitioners transferred another $13,000 from the nursery bank account and, during February 1987, deposited a small amount of nursery receipts into this account.

Account No. 12-6064-5 at First National Bank of Canton was used primarily for petitioners' mortgage lending activity. All 11 deposits made during 1986 were in cash, with the largest being $9,000; the 1986 deposits totaled $42,796.91 and began on July 28, 1986. All deposits from January through August 1987 were in cash; there were 11 such deposits ranging in amounts from $1,990 to $7,476.34. Deposits occurring later in 1987 also included mortgage payment checks from the borrowers. Deposits during 1987 totaled $104,760.34. All identifiable checks that were written on this account during 1986 and 1987 were payable to mortgage borrowers, with the exception of one check for $1,000 that was payable to Mrs. Gandy during 1986 and one check for $10,000 to the nursery in 1987.

During some portion of the years in issue, petitioners maintained the following CD accounts at Sunbelt Savings:

| Account Name | Account No. |
|---|---|
| Dennis Gandy | 1-03-00006962 |
| Dennis Gandy | 1-03-00006970 |
| Dennis Gandy | 1-03-00007002 |
| Dennis Gandy, Trustee for Carolyn or Dominick Gandy | 1-03-00006988 |
| Dennis Gandy, Trustee for Carolyn or Dominick Gandy | 1-03-00007218 |

The first four CD's listed above were funded with the proceeds from the SBA loans. Petitioners deposited a few mortgage payments into account No. 1-03-00007218, along with the interest from the other four CD's. Petitioners transferred funds from this CD account to the nursery bank account as follows:

| Date | Amount |
|---|---|
| July 25, 1985 | $45,000.00 |
| Nov. 25, 1985 | 20,000.00 |
| July 8, 1986 | 20,000.00 |
| Oct. 1, 1986 | 23,158.12 |

Petitioners closed all five CD accounts at Sunbelt Savings on April 16, 1987. The proceeds were used to reduce the balance of the PCA loans and to pay off the December 18, 1986, loan for $90,000, and the August 1, 1986, loan for $90,000.

During some portion of the years in issue, four CD accounts were maintained with the First National Bank of Canton styled "Carolyn Gandy" (account Nos. 50-5668-4, 50-5669-2, 50-5827-6, 50-5847-4). The four CD's that established those four accounts were purchased during 1987 for a total of $10,800, $8,400 of which was presented in cash.

During some portion of the years in issue, Mrs. Gandy maintained a bank account at the First National Bank of Canton styled "Gandy Travel Agency" (account No. 00-1471-2).  The business expenses of Gandy Travel Agency (the travel agency) were paid from this account.  Of the $8,300 in loans that Mrs. Gandy borrowed in the name of the travel agency in 1987, $7,600 was deposited into this account and $700 into account No. 12-6133-8.

During the years in issue, Burnice Gandy maintained a personal bank account at the First State Bank of Van styled "Burnice Gandy" (account No. 10-1106-3) (the Burnice Gandy account).  With very few exceptions, the deposits during 1985 and 1986 consisted of Burnice Gandy's Social Security and veterans' benefits and interest.  However, on January 28, 1985, a check payable to the nursery in the amount of $9,831.50 was deposited into the Burnice Gandy account; on the back of the check appeared the handwritten endorsement "Gandy's Nursery".  The total deposit to the Burnice Gandy account on that date was $10,000.  Also on January 28, 1985, a check in the amount of $10,000 was written from the Burnice Gandy account to Mr. Gandy.  On November 24, 1985, a check in the amount of $10,000 was written from the Burnice Gandy account to Mr. Gandy.

On March 23, 1987, petitioners deposited into the Burnice Gandy account $5,000 out of a check for $13,437.32 payable to the nursery.  On July 1, 1987, a check for $10,000 payable to Burnice

Gandy from the nursery bank account was deposited into the Burnice Gandy account. On October 30, 1987, one check payable to the nursery ($1,000) and checks from two of petitioners' mortgage loan borrowers ($233 and $707.25) were deposited into the Burnice Gandy account.

During 1987, the following deposits of currency were made into the Burnice Gandy account:

| Date | Amount |
|------|--------|
| June 22, 1987 | $ 5,000.00 |
| Sept. 14, 1987 | 4,000.00 |
| Sept. 16, 1987 | 3,000.00 |
| Oct. 6, 1987 | 3,000.00 |
| Oct. 8, 1987 | 7,375.60 |
| Oct. 9, 1987 | 2,600.00 |
| Oct. 22, 1987 | 6,600.00 |
| Oct. 30, 1987 | 6,459.75 |
| Nov. 5, 1987 | 5,000.00 |
| Nov. 30, 1987 | 5,000.00 |
| Dec. 2, 1987 | 5,000.00 |
| Dec. 8, 1987 | 5,000.00 |
| Dec. 10, 1987 | 5,000.00 |
| Dec. 14, 1987 | 9,900.00 |
| Dec. 21, 1987 | 5,000.00 |
| Dec. 23, 1987 | 5,000.00 |
| | $82,935.35 |

During 1987, the following checks were drawn on the Burnice Gandy account and deposited into the nursery bank account.

| Date of Check | Amount |
|---|---|
| June 22, 1987 | $ 5,000 |
| -- 1987 | 10,000 |
| Sept. 14, 1987 | 10,000 |
| -- 1987 | 10,000 |
| Oct. 23, 1987 | 10,000 |
| Oct. 31, 1987 | 10,000 |
| Nov. 6, 1987 | 10,000 |
| Dec. 2, 1987 | 10,000 |
| Dec. 7, 1987 | 10,000 |
| Dec. 13, 1987 | 10,000 |
| Dec. 23, 1987 | 10,000 |
| | $105,000 |

During 1988, Mr. Gandy maintained a personal bank account at the First National Bank of Canton styled "Dennis Gandy" (account No. 12-6161-9).

During 1988 and 1989, Mr. Gandy and Burnice Gandy maintained a personal bank account at the First State Bank of Ben Wheeler styled "Burnice and Dennis Gandy" (account No. 21-4839-0) (the B&D account). The B&D account was opened on July 19, 1988. Mr. Gandy opened the bank account by depositing two checks payable to the nursery that totaled $4,770.10 plus $2,000 in cash. By late August 1988, a stamp was used to endorse checks; that stamp read:

> Gandy's Nursery
>  Burnice Gandy
> Acct. 21-4839-0

Mr. Gandy regularly caused checks payable to the nursery to be deposited into the B&D account. Total deposits from July 19, 1988, to December 31, 1988, were $242,172.39. Deposits during

1989 totaled $249,125.89.  The following deposits were in

currency:

|  | Date | Amount |
|------|---------|-----------|
| 1988 | July 19 | $  2,000.00 |
|      | July 22 | 3,830.00 |
|      | July 25 | 8,675.50 |
|      | July 26 | 5,000.00 |
|      | July 29 | 5,000.00 |
|      | Aug.  1 | 8,000.00 |
|      | Aug.  2 | 8,000.00 |
|      | Aug.  3 | 8,000.00 |
|      | Aug.  4 | 8,000.00 |
|      | Aug. 15 | 5,139.00 |
|      | Aug. 17 | 9,000.00 |
|      | Sept.  1 | 7,000.00 |
|      | Sept.  9 | 5,000.00 |
|      | Sept. 16 | 5,000.00 |
|      | Sept. 28 | 5,000.00 |
|      | Oct.  3 | 9,115.00 |
|      | Oct.  7 | 7,000.00 |
|      | Oct. 13 | 4,970.00 |
|      | Oct. 25 | 5,685.00 |
|      | Oct. 28 | 1,958.00 |
|      | Nov. 23 | 2,500.00 |
|      | Dec. 23 | 2,525.00 |
|      | Dec. 30 | 578.00 |
|      | 1988 | $126,975.50 |
| 1989 | June 27 | $ 9,500.00 |
|      | Sept.  8 | 8,000.00 |
|      | Sept. 25 | 9,800.00 |
|      | Sept. 26 | 9,800.00 |
|      | Sept. 27 | 9,000.00 |
|      | Nov. 28 | 3.00 |
|      | 1989 | $46,103.00 |

Mr. Gandy transferred money from the B&D account to the
nursery by check; the memo section on those checks indicated
"Loan".  During 1988, a total of $224,500 was deposited into the
nursery bank account from the B&D account.  During 1989, the

amounts transferred into the nursery bank account from the B&D account totaled $187,000.

At various times during the years in issue, Mr. Gandy made statements to petitioners' employees, relatives, and friends to the effect that he was "sticking it to Uncle Sam" and "going to beat the government" and that "the only way to get ahead was to steal from yourself and cheat the government, or not to show my cash transactions, you know, in business."

The Lake House

At some point prior to January 1985, Mr. Gandy cosigned a loan for Doug Christensen (Christensen).  The security for this loan was a property known as the lake house.  Christensen failed to make payments, and the bank foreclosed on the mortgage. Petitioners borrowed $115,000 from Lindale State Bank on January 10, 1985, and, of that amount, used $99,027.67 to redeem the lake house; the remaining $15,972.33 went to pay off a loan of $15,000 that Mr. Gandy had borrowed from Lindale State Bank on January 16, 1984.

Petitioners made the following payments on the loan from Lindale State Bank, all of which were made in cash:

|  | Date | Amount |
|------|------|--------|
| 1985 | Jan. 27, 1985 | $ 5,000.00 |
|  | Feb. 28, 1985 | 1,106.40 |
|  | Feb. 28, 1985 | 8,500.00 |
|  | Apr. 7, 1985 | 1,106.40 |
|  | Apr. 7, 1985 | 8,500.00 |
|  | Apr. 10, 1985 | 9,500.00 |
|  | Apr. 11, 1985 | 9,500.00 |
|  | Apr. 14, 1985 | 9,500.00 |
|  | Apr. 29, 1985 | 9,500.00 |
|  | 1985 | $62,212.80 |
| 1986 | Feb. 11, 1986 | 8,500.00 |
|  | Feb. 20, 1986 | 9,000.00 |
|  | Feb. 24, 1986 | 9,500.00 |
|  | Feb. 25, 1986 | 9,500.00 |
|  | Feb. 26, 1986 | 9,500.00 |
|  | Mar. 4, 1986 | 8,500.00 |
|  | Mar. 19, 1986 | 6,266.08 |
|  | 1986 | $60,766.08 |

During 1987, the lake house was destroyed by fire. In 1987, petitioners received insurance reimbursement in the amount of $125,000 for the loss of the lake house and its contents. On April 8, 1987, petitioners deposited the insurance check into the nursery bank account. Petitioners did not rebuild the house. During 1987, petitioners sold the lot on which the destroyed lake house had been located for $31,000. Settlement was conducted on April 23, 1987; settlement charges to petitioners totaled $2,637.89.

Personal Expenditures

On June 28, 1985, petitioners bought a 1985 Cadillac. To purchase this car, petitioners traded in a 1984 Cadillac Eldorado and paid $17,750 in cash. On July 1, 1986, petitioners paid

$20,501 in cash for the purchase of real estate, causing a Currency Transaction Report to be filed by Mineola Federal Savings and Loan Association. On December 23, 1986, petitioners purchased a mink coat for $2,097.24; they paid $1,900 of this amount in cash and charged the balance to their American Express card.

Petitioners' Divorce

Petitioners were experiencing marital difficulties during the mid-1980's. Petitioners entered into a divorce agreement on June 13, 1988. This agreement was incorporated in the final decree of divorce signed on June 14, 1988. The agreement awarded the following property to Mrs. Gandy: the loan notes that were held by petitioners (said to total approximately $869,000); $50,000 to be paid on the date of divorce; $50,000 per year for 5 years to be paid annually commencing on June 15, 1989; a 1985 Cadillac convertible; a 1986 Chevrolet van; the travel agency; 40 percent of net recovery from a pending lawsuit; and all personal property items in her possession. The property awarded to Mr. Gandy was: the nursery, the marital home, 60 percent of the net recovery from the pending lawsuit, and all personal property items in his possession. Among the liabilities that were assumed by Mrs. Gandy were any debts of the travel agency and 40 percent of the tax liabilities for 1987 and prior years. Liabilities assumed by Mr. Gandy included those of the nursery

and 60 percent of the tax liabilities for 1987 and prior years. At the time of the agreement, petitioners' 1987 tax return had not been filed. Petitioners each received physical custody of one of their two children and visitation rights as to the other child.

Financial Statements and Federal Income Tax Returns

1985 through 1987

Petitioners engaged Shinn to prepare the nursery's financial statements and their 1985 income tax return. Mr. Gandy was interested in seeing how well the nursery was doing, i.e., what the income and expenses were and determining what his tax liabilities would be based on that income. Based on conversations with petitioners, Shinn assumed that all income was being deposited into the nursery bank account and that all expenses were being paid by check. Shinn informed petitioners that he would be using the nursery bank account information to prepare the financial statements and the tax return and that income and expense items would have to go through the bank account to be picked up for tax return purposes. Shinn used the computer at his office to prepare the nursery's financial statements, based on the nursery's bank statements. Shinn reviewed the financial statements with Mr. Gandy regularly throughout the year. Mr. Gandy never brought to Shinn's

attention any expenses or receipts that were omitted from those statements.

Petitioners' 1985 through 1987 Federal income tax returns were filed reporting a status of married filing jointly. The tax returns for 1985 through 1987 were prepared by Shinn. Shinn prepared petitioners' 1985 through 1987 tax returns from information supplied to him by petitioners, bank statements, deposit tickets, canceled checks, and check stubs from the nursery bank account. Petitioners did not provide Shinn with the ledgers or inform him of their existence. Petitioners never told Shinn about the checks payable to the nursery that were cashed or about those deposited into accounts other than the nursery bank account. Mrs. Gandy never gave personal checking account information to Shinn. It was Shinn's understanding that petitioners used the nursery bank account for their personal expenses and that they did not have a personal checking account.

Shinn followed the method that had been used by the preparer of petitioners' 1984 tax return. The records from the nursery bank account were used by Shinn to compute the gross receipts of the nursery. Mr. Gandy represented to Shinn that the deposits that were identified as being from Burnice Gandy were loans. Shinn did not include any cash income or expenses when preparing Schedule F.

Shinn used Forms 1099 to calculate petitioners' interest income. For 1985 and 1986, Schedule B listed interest from institutional sources only. In 1988, for preparation of their 1987 tax return, petitioners provided to Shinn a list of the mortgage notes and payment amounts from which Shinn calculated additional interest income. On petitioners' 1987 Federal income tax return, they reported a $10,000 capital gain on the destruction of the lake house ($125,000 insurance proceeds less $115,000 basis).

Mrs. Gandy did not review or discuss the completed tax returns with Shinn. Mr. Gandy never reviewed the returns with Shinn prior to signing them. Later, Mr. Gandy brought to Shinn's attention that the interest income on the 1987 tax return had been overreported. After reviewing the list of mortgages, Shinn realized that the 1987 interest income was overstated and also that mortgage interest had been received in 1986 and not reported on the returns for that year. Shinn informed Mr. Gandy of this. Petitioners did not file amended returns for 1986 or 1987.

### 1988 and 1989

Mr. Gandy filed tax returns for 1988 and 1989 reporting a filing status of single. His 1988 tax return was prepared by Shelby L. Davidson (Davidson). Davidson was not a certified public accountant at that time. Davidson prepared Mr. Gandy's 1988 tax return from information supplied by Mr. Gandy, including

the 1988 bank statements from the nursery bank account, yearend summary, yearend balance sheet, and profit and loss statements. The financial statements were reports generated from the nursery's computer. Davidson was not aware of any cash expenditures by the nursery.

Dozier was the nursery employee who served as Davidson's contact. Dozier supplied Davidson with a handwritten list of the deposits into the nursery bank account and the supporting deposit slips. Both Mr. Gandy and Dozier told Davidson that the deposits that were identified as being from Burnice Gandy were loans; these deposits totaled $217,500. They also identified other purportedly nontaxable amounts, such as loans from PCA or insurance proceeds.

The 1988 bank statements from the nursery bank account were used by Davidson to compute the gross receipts of the nursery for 1988. Davidson compared the book amount of gross receipts to the amount of the bank deposits, excluding those deposits that were identified as loans or other nontaxable amounts, and used the net deposits, which was the higher amount. Davidson was not aware of any deposits of nursery receipts being made into any bank accounts other than the nursery bank account, nor was he aware of any checks to the nursery being cashed.

Mr. Gandy represented to Davidson that Mrs. Gandy had received the mortgage notes in the divorce property settlement

and that she would be reporting the interest income from those notes. Davidson met with Mr. Gandy to review the completed return. Thereafter, Davidson learned that the Gandys' divorce had occurred during 1988 and, in late 1988, he sent to Mr. Gandy a letter indicating that the 1988 tax return should be amended to include the interest earned on the mortgage notes while they were community property. An amended 1988 tax return was not filed for Mr. Gandy.

Mr. Gandy's 1989 tax return was prepared by Gary W. Camp (Camp), a certified public accountant. Camp prepared the 1989 tax return from information supplied to him by Mr. Gandy: a balance sheet, profit and loss statement, fuel costs, and a list of equipment that was purchased and traded. This information provided by Mr. Gandy was used by Camp to compute the gross receipts of the nursery for 1989. Camp did not have any bank statements or ledgers.

Summary

The following table summarizes pertinent items from the tax returns for the years in issue:

| Item | 1985 | 1986 | 1987 | 1988 | 1989 |
|---|---|---|---|---|---|
| Interest income | $66,606.75 | $44,317.57 | $135,924.00 | --- | --- |
| Capital gains | --- | --- | 10,000.00 | --- | --- |
| Schedule E income | --- | 3,844.61 | --- | --- | --- |
| Schedule F sales | 1,706,646.90 | 1,971,310.40 | 2,210,649.00 | $2,049,090.00 | $2,650,964.00 |
| Schedule F gross income | 1,709,159.90 | 1,973,223.40 | 2,211,563.00 | 2,051,565.00 | 2,696,214.00 |
| Schedule F net income | (88,292.14) | (77,901.58) | (345,272.00) | (146,926.00) | (140,465.00) |
| Net operating loss | (38,201.08) | (25,225.39) | --- | --- | (401,239.00) |
| Adjusted gross income | (59,886.47) | (54,964.79) | (199,348.00) | (146,926.00) | (541,704.00) |
| Fuel credit | 1,913.00 | 914.00 | 2,475.45 | 3,400.00 | 2,677.00 |
| Refund | 9,913.00 | 914.00 | 2,475.45 | 3,400.00 | 2,677.00 |

The nursery's labor and transportation expenses as determined by respondent were:

| | Labor | | Transportation | |
|---|---|---|---|---|
| Year | Dollars | Percentage of Sched. F Gross Income | Dollars | Percentage of Sched. F Gross Income |
| 1985 | $356,607.96 | 16.46 | $245,962.96 | 11.35 |
| 1986 | 482,581.18 | 19.40 | 218,518.61 | 8.78 |
| 1987 | 717,487.00 | 27.71 | 321,173.00 | 12.40 |
| 1988 | 751,363.00 | 32.90 | 262,931.00 | 11.51 |
| 1989 | 927,436.00 | 31.02 | 269,088.00 | 9.00 |

The following table summarizes information relating to the time of filing of petitioners' tax returns:

| 1985 | 1986 | 1987 | 1988 | 1989 |
|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| Petitioners signed | Aug. 12, 1986 | Oct. 15, 1987 | Dec. 26, 1988 | Oct. 1, 1989 | undated[1] |
| Post-marked | Aug. 13, 1986 | Oct. 15, 1987 | Dec. 29, 1988 | Oct. 25, 1989 | Sept. 20, 1990 |
| Received | -- | Oct. 16, 1987 | -- | -- | Sept. 24, 1990 |
| Due date | -- | Oct. 15, 1987 | Oct. 15, 1988 | Oct. 15, 1989 | -- |

[1] Signed by preparer on Sept. 12, 1990.

## Criminal Investigation and Respondent's Determination

On November 1, 1989, special agents of the IRS Criminal Investigation Division executed a search warrant on the nursery. As a result, IRS agents seized several boxes of records. The agents located the two sets of ledgers. On the same date, Mr. Gandy gave his voluntary consent to a search of person, premises or conveyance. As a result of the consensual search of the Gandy residence, IRS agents seized several boxes of records, including customer invoices, real estate records, financial records, and $32,874 in currency.

For 1985, 1986, and 1987, respondent used the specific items method to determine petitioners' income. Respondent reconstructed petitioners' Schedule F income from the nursery's records, using primarily the nursery's invoices. During the course of the criminal investigation, IRS special agents sent a form letter to more than 200 customers of the nursery requesting information concerning their purchases from the nursery. Information on petitioners' interest income from the mortgage loans was obtained by contacting the individual borrowers that were listed in the divorce records.

Respondent made the following adjustments to petitioners'
income:

| Item | 1985 | 1986 | 1987 |
|------|------|------|------|
| Interest income | $519 | $31,342 | ($55,660) |
| Capital gain | -- | -- | 13,062 |
| Schedule F gross receipts | 457,293 | 514,264 | 378,168 |
| Net operating loss | 38,201 | 25,225 | -- |

Respondent allowed an investment tax credit in the amount of
$38,077 for 1985.  Respondent determined self-employment tax on
the Schedule F income for each of the years in issue.  Respondent
mailed a notice of deficiency for 1985 through 1987 to
petitioners on September 21, 1993.

For 1988 and 1989, respondent used the bank deposits method
to determine Mr. Gandy's income.  Respondent mailed a notice of
deficiency for the taxable years 1988 and 1989 to Mr. Gandy on
September 21, 1993.  In the notice of deficiency, respondent made
the following adjustments:

| Item | 1988 | 1989 |
|------|------|------|
| Schedule F gross receipts | $217,500 | $521,975 |
| Net operating loss | -- | 401,239 |

Respondent determined self-employment tax on the Schedule F
income for both years.

By amendment to answer, respondent revised adjustments to
income as follows:

| Item | 1988 | 1989 |
|------|------|------|
| Schedule F gross receipts | $232,068 | $293,203 |
| Net operating loss | -- | 401,239 |

Respondent adjusted the amounts of the deficiencies in income tax, the additions to tax, and the penalty accordingly.

On September 4, 1992, petitioners pleaded guilty and were convicted of subscribing to a false return for 1987, in violation of section 7206(1).

OPINION

Petitioners do not deny that they had unreported gross receipts from the nursery during the years in issue. They also had unreported interest income during certain of those years. For 1986, they do not dispute that the omitted income exceeded 25 percent of the gross income stated in their return; thus, for that year, the period of limitations is 6 years, under section 6501(e)(1)(A), and assessment is not barred.

Mr. Gandy's return for 1989 was delivered to the IRS on September 24, 1990. Petitioners claim that the return was untimely filed; that pursuant to section 7502(a)(1), the return was filed when postmarked on September 20, 1990; and, therefore, the notice of deficiency for that year, mailed on September 21, 1993, was untimely. Section 7502(a)(1) only applies, however, if the postmark date falls within the prescribed period or on or before the prescribed date for the filing (including any extension granted for such filing) of the return. Sec. 7502(a)(2). There is no evidence of an extension of time to file. Without an extension from April 15, 1990, up to or beyond

September 20, 1990, section 7502 does not apply, and the filing date is the date received by the IRS, September 24, 1990.  Emmons v. Commissioner, 92 T.C. 342, 346-347 (1989), affd. 898 F.2d 50 (5th Cir. 1990).  If Mr. Gandy had an extension until September 24 or later, the return was timely, section 7502 would not apply and the returns would be "filed" when delivered on September 24, 1990.  Estate of Mitchell v. Commissioner, 103 T.C. 520, 522 (1994).  The notices of deficiency were mailed within 3 years of that date.  Therefore, assessment is not barred for 1989.

For 1985, 1986, 1987, and 1988, respondent relies on section 6501(c)(1) and, therefore, must prove that the returns for those years were false or fraudulent with the intent to evade tax.  Respondent also has an alternative position under section 6501(e) for 1986, based on a 25-percent omission from gross income.

Because the question of fraud is determinative as to the statutory period of limitations for 3 of the 5 years in issue as well as penalties or additions to tax for all years, we first discuss the evidence and our conclusions with respect to fraud.  Proof of fraud against either spouse prevents the running of the period of limitations as to both spouses with respect to the income tax deficiency on a joint return.  Hicks Co. v. Commissioner, 56 T.C. 982, 1030 (1971), affd. 470 F.2d 87 (1st Cir. 1972).  In these cases, however, the evidence for 1985, 1986, and 1987 implicates both Mr. and Mrs. Gandy.

Underpayments Attributable to Fraud

The addition to tax for fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from a taxpayer's fraud. Helvering v. Mitchell, 303 U.S. 391, 401 (1938).

Section 6653(b) as applicable to 1985 imposes an addition to tax of 50 percent of the underpayment if any portion of the underpayment is due to fraud, and an additional amount equal to 50 percent of the interest with respect to the portion of the underpayment attributable to fraud. For 1986 and 1987, section 6653(b) imposes an addition to tax of 75 percent of the portion of the underpayment attributable to fraud, and an additional amount equal to 50 percent of the interest with respect to such portion. For 1988, section 6653(b) imposes an addition to tax of 75 percent of the underpayment attributable to fraud. For 1989, the fraud penalty imposed under section 6663 is equal to 75 percent of the portion of the underpayment attributable to fraud.

To overcome the limitations defense and to sustain the additions to tax or penalties for fraud, respondent must prove, by clear and convincing evidence, for each year, an underpayment of tax and fraudulent intent. Sec. 7454(a); Rule 142(b). Where, as here, the allegations of fraud are intertwined with unreported

and indirectly reconstructed income, respondent can satisfy the burden of proving an underpayment in one of two ways, i.e., by proving a likely source of the underreported income or by disproving an alleged nontaxable source. See DiLeo v. Commissioner, 96 T.C. 858, 873-874 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Parks v. Commissioner, 94 T.C. 654, 661 (1990).

In these cases, petitioners have admitted that they had unreported income from nursery receipts and from interest. Respondent reconstructed the income for the first 3 years by reference to petitioners' invoices and ledgers and for the last 2 years by reference to bank deposits. Respondent's agents' actions were reasonable in view of the state of petitioners' records and the evidence of the manner in which petitioners' tax returns were prepared. Respondent is not required to prove the exact amount of the underpayment. See Webb v. Commissioner, 394 F.2d 366, 373, 379 (5th Cir. 1968), affg. T.C. Memo. 1966-81; DiLeo v. Commissioner, supra at 868, 873; Smith v. Commissioner, T.C. Memo. 1976-114.

Petitioners contend that, notwithstanding their admission of unreported income, they had additional deductions for expenses paid by cash that offset or substantially reduce the amount of unreported income. They further contend that they believed that they did not owe additional tax because the unreported amounts were reinvested in the business. However, over the years that

the investigation was conducted by the Government and through trial of these cases, they did not present any documents or witnesses that corroborated their claims of substantial deductible expenses not reported on their tax returns.  As discussed below, their belated attempts to reconstruct deductions are not persuasive.  Even in criminal tax evasion cases, where the Government bears the greater burden of proof beyond a reasonable doubt, it is well settled "that evidence of unexplained receipts shifts to the taxpayer the burden of coming forward with evidence as to the amount of offsetting expenses, if any."  Siravo v. United States, 377 F.2d 469, 473 (1st Cir. 1967); accord, e.g., United States v. Hiett, 581 F.2d 1199, 1202 (5th Cir. 1978); United States v. Garguilo, 554 F.2d 59, 62 (2d Cir. 1977); Elwert v. United States, 231 F.2d 928, 933 (9th Cir. 1956); United States v. Bender, 218 F.2d 869, 871 (7th Cir. 1955); United States v. Link, 202 F.2d 592, 593 (3d Cir. 1953). See Franklin v. Commissioner, T.C. Memo. 1993-184; Barragan v. Commissioner, T.C. Memo. 1993-92, affd. without published opinion 69 F.3d 543 (9th Cir. 1995).  Respondent's burden of proving an underpayment has been satisfied.

Respondent must also prove fraudulent intent.  This burden is met if it is shown that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes.  Webb v.

Commissioner, supra at 377-380. Fraud will never be presumed. It may be proved by circumstantial evidence, because direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Estate of Temple v. Commissioner, 67 T.C. 143, 159, 161 (1976). Both petitioners pleaded guilty and were convicted of filing a false return for 1987, and their pleas and convictions may also be considered as evidence of intent. Wright v. Commissioner, 84 T.C. 636, 643-644 (1985). A pattern of consistent and substantial understatements of income is strong evidence of fraud. Webb v. Commissioner, 394 F.2d at 379; Marcus v. Commissioner, 70 T.C. 562, 577 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. 1980).

The courts have developed a number of objective indicators or "badges" of fraud that may establish fraudulent intent, including understatement of income, inadequate records, implausible or inconsistent explanations of behavior, concealment of assets, and substantial dealings in cash. See, e.g., Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601. In these cases, respondent contends that petitioners engaged in a 5-year pattern of understating substantial amounts of income, maintained inadequate books and records, concealed assets by use of "secret" bank accounts, such as the account in the name of Burnice Gandy and the personal

checking accounts, gave implausible or inconsistent explanations of behavior, concealed their assets and their income, and had numerous dealings in cash.

Neither the underreporting of income nor the use of cash is disputed by petitioners. Petitioners also acknowledge that they kept two sets of ledgers reflecting income from two groups of customers. Many of the customers' checks relating to sales recorded in one group of ledgers were cashed. The preparers of petitioners' tax returns were not advised of the cashing of customers' checks and, because the tax returns were prepared based on records of bank deposits, receipts from the cashed checks were not reported. We are convinced that both petitioners knew that these methods of keeping books and preparing returns would result in underreporting of their income. As discussed further below, we reject petitioners' contention that the proceeds of cashed checks, some of which were used for interest-bearing loans to others and some for their personal living expenses, were all spent on deductible expenditures.

We are convinced that petitioners' use of cash was intended to conceal their income and their assets. Our view in this regard is based in part on testimony, corroborated by documentary evidence, that Mrs. Gandy instructed employees to negotiate checks or otherwise engage in cash transactions in amounts

totaling less than $10,000 in order to avoid required reporting of those transactions to the IRS.

Mr. Gandy made several representations, including to his preparers and to respondent's agents, that amounts deposited in the nursery account from Burnice Gandy constituted loans, when the evidence is convincing that Burnice Gandy could not have made those loans and that the source of the funds was nursery receipts. Mr. Gandy contends that receipts were concealed in relation to the divorce to protect them from Mrs. Gandy. Even if such concealment served two purposes, the effect and apparent intention was also to underreport income. Several witnesses reported that Mr. Gandy expressed his intention to "beat the government" by devices including use of cash. None of these incriminating statements were refuted by petitioners.

Petitioners dispute respondent's agents' accounts of the original interview with Mr. Gandy. Even disregarding respondent's arguments concerning inconsistencies and false statements made during that investigation, the record reflects many inconsistent and implausible statements. Much of the implausibility is in the form of petitioners' claimed defenses to respondent's determinations. Petitioners engage in rhetoric and hyperbole unsupported by the record in attempts to blame others for their current predicament and to obscure the compelling evidence against them. For example, they assert that an

unspecified amount was embezzled by a former employee, but the only support they cite is the assertion of counsel during trial that the employee was indicted.  There is neither testimony nor documentary evidence to substantiate the claim, and indictment alone would not establish anything.  (Counsel was warned several times during trial that such assertions would be given no weight.)  They argue that they are handicapped by the Government's seizure of records, but the Court found that the records were returned to them.  They imply that certain witnesses have grudges and are biased, but they have failed to discredit the testimony given by those witnesses.  They assert that they did not take additional steps that would have indicated fraud, such as asking that their mortgages be repaid in cash; these arguments are unavailing.  Presumably the borrowers wanted evidence of interest payments for their own purposes.  In any event, it is not a defense that petitioners did not do more to further their fraud.

Petitioners contend that they relied on their accountants to prepare accurate returns, and reasonable reliance on a competent agent may be a sufficient defense to fraud.  However, such reliance indicates an absence of fraudulent intent only when the agent has been provided with complete information from which an accurate return could have been prepared and there is no other evidence indicating fraudulent intent.  Merritt v. Commissioner,

301 F.2d 484 (5th Cir. 1962), affg. T.C. Memo. 1959-172.  In this instance, there is clear and convincing evidence that petitioners did not inform their tax return preparers of the diverted receipts and misled the preparers about their income, assets, and the source of deposits into their bank accounts.

Petitioners contend that they were unsophisticated and reasonably relied on their preparers.  We do not accept their testimony in this regard.  These cases are comparable to Estate of Temple v. Commissioner, supra, and we incorporate the same analysis here.  There the Court stated:

> * * * [The taxpayer's] conduct was intimately entwined with the inaccurate recording of his business income.  He often took receipt of incoming checks, endorsed them, sometimes withheld cash, and carried them to the bank for deposit.  This subsequently resulted in omitted or inaccurate journal entries. * * *  In addition, * * * [the taxpayer] had a consistent practice of cashing checks, which generated no deposit slips, and thereby prevented income from being recorded in the journal.
>
> While a taxpayer's reliance upon his accountant to prepare accurate returns may indicate an absence of fraudulent intent, this is true in the first instance only if the accountant has been supplied with all the information necessary to prepare the returns. * * * [The estate] argues in this regard that * * * [the preparer] had total access to all of the * * * [business'] books and records, so that even though the journal was inaccurate, a thorough professional job of accounting would have uncovered the inaccuracies.  Of course, the thorough audit conducted by respondent's agents did discover many omitted and erroneous entries.  However, we cannot conclude on the basis of the record before us that * * * [the preparer] was retained to check with * * * [the business'] customers in order to find out whether they made payments to * * * [the business] which were not recorded in the journal or to

> otherwise doublecheck the journal entries made by the
> bookkeepers.  The evidence points to the contrary.
> * * * [Estate of Temple v. Commissioner, 67 T.C. at
> 162-163; citation and fn. ref. omitted.]

See also Webb v. Commissioner, 394 F.2d at 379-380; Foster v.
Commissioner, 391 F.2d 727-732 (4th Cir. 1968), affg. on this
issue and revg. on another issue T.C. Memo. 1965-246; Roose v.
Commissioner, T.C. Memo. 1995-585, affd. without published
opinion 108 F.3d 1377 (6th Cir. 1997); Morris v. Commissioner,
T.C. Memo. 1992-635, affd. without published opinion 15 F.3d 1079
(5th Cir. 1994); Becerra v. Commissioner, T.C. Memo. 1984-134.

For 1985, 1986, and 1987, respondent has presented clear and
convincing evidence of fraud as to both petitioners relating to
unreported gross receipts of the nursery.  For 1988 and 1989,
respondent has presented clear and convincing evidence of fraud
with respect to Mr. Gandy.  The evidence is also clear and
convincing that petitioners used cash to conceal income and
assets.  That they may also have used cash for deductible
expenses was, in our view, in furtherance of their fraudulent
activities.  Thus, we are convinced that the entire net
underpayments, after adjustment of the nursery income as set
forth below, are due to fraud.  The statute of limitations,
therefore, does not bar assessment for any year, and the
additions to tax and penalties for fraud will be sustained for
each year.

Nursery Income

Petitioners have failed to raise any bona fide disputes about the unreported income for the years in issue, and Mr. Gandy acknowledges that his expenses were not understated for 1988 or 1989. From the time of the investigation in 1992 through filing of the petition in 1993 and prior to trial in 1996, petitioners contended that their expenses were correctly reported on their tax returns and failed to raise any claim for additional deductions. At the time of trial, and in their briefs, however, they assert that they are entitled to additional labor and transportation expense deductions as follows:

| Item | 1985 | 1986 | 1987 |
|---|---|---|---|
| Labor | $346,172 | $325,229 | $123,094 |
| Transportation | 24,356 | 92,178 | 2,127 |
| | $370,528 | $417,407 | $125,221 |

These claims are based on their assertions that their profit percentage for those years, under respondent's determinations, exceeded their profits in other years and profits earned by their competitors. These claims are based on vague estimates by Mr. Gandy and by competitors that are totally unsupported by reliable evidence. The claims were neither timely nor detailed enough to provide respondent with a reasonable opportunity to investigate their validity. Moreover, to the extent that the claims are based on payments in cash of expenses for wages, to

"coyotes" who transported the laborers from Mexico, and unsubstantiated trucking expenses, they are undermined by evidence that payments to "coyotes" and trucking expenses for which no receipts were obtained were recouped by deductions from wages paid to the employees.  Finally, the amounts claimed are simply not credible.  Petitioners seek to increase the deductions for labor costs by nearly doubling them for 1985 (adding $346,172 to $356,607.96 claimed on the original return) and adding an additional two-thirds of the amount claimed for 1986 (adding $325,229 to $482,581.18 claimed on the return).  We are not persuaded that they had that much cash available, after diverting cash to their loan business and other personal uses, unless they had substantial amounts of unreported cash income as well.

Nonetheless, in view of the nature of petitioners' business during the years in issue and their use of imported labor and payments of those laborers in cash, it is likely that some expenses that would be deductible were paid in cash.  Under these circumstances, we must weigh heavily against petitioners, whose inexactitude is of their own making.  We also bear in mind that petitioners had some cash sales in undetermined amounts during the years in issue that were not included in respondent's computation of unreported income.  Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930).  However, the Court must have some basis on which an estimate may be made.  Williams v. United States, 245

F.2d 559 (5th Cir. 1957); <u>Vanicek v. Commissioner</u>, 85 T.C. 731, 743 (1985). We have taken into account the changing nature of the nursery's business from primarily B&B to container trees and the effect on transportation costs as well as labor costs. We conclude that petitioners may deduct an additional $100,000 for labor in 1985 and in 1986 and $50,000 for labor in 1987. We are not persuaded that they are entitled to deduct any additional transportation expenses.

<u>Interest Income</u>

Petitioners admit making loans and receiving interest payments beginning with the 1985 taxable year. Their argument is that not all payments were made in a timely fashion and, thus, respondent has overstated the amount of interest received.

Respondent obtained copies of some of the borrowers' checks or other records of payments. They also interviewed the borrowers. From this information, respondent calculated the amount of petitioners' mortgage interest income. Petitioners have submitted no records that they may have kept regarding the borrowers' repayments of the mortgage loans. Nor have they testified that any borrowers failed to make the payments used by respondent in calculating the additional interest income. We are persuaded that the amounts of interest income determined by respondent were correct. We sustain respondent's determination of petitioners' interest income.

Capital Gains From Lake House

Sections 1001 and 61 require a taxpayer to recognize gain on the disposition of property. The gain is the excess of the amount realized over the adjusted basis. Sec. 1001(a). Adjusted basis is the basis, or cost, of the property subject to certain adjustments not pertinent here. Secs. 1001, 1012.

Petitioners paid $99,027.67 to redeem the lake house from foreclosure. Petitioners have not proven any additional basis in the property. They received $125,000 in insurance proceeds and sold the property for $31,000. They paid $2,637.89 in closing costs. The amount realized was $153,362.11 ($125,000 plus $31,000 less $2,637.89). Petitioners' gain was thus $54,334.44 ($153,362.11 less $99,027.67). Petitioners reported gain of $10,000. In the notice of deficiency, respondent increased petitioners' income by $13,062. The adjustment for the gain on lake house will be sustained as to this amount.

Net Operating Losses

Petitioners contend that they are entitled to a net operating loss carried forward to 1985 from 1983 and 1984. Petitioners presented no evidence concerning the net operating losses. They rely solely on a schedule attached to their return as filed and an assertion that an audit of their return for 1984 resulted in no change. The loss claimed apparently related back to 1981 and 1982, years for which there was no evidence at all.

Petitioners merely testified vaguely about losses in 1983 and 1984. Even if respondent had audited the return for 1984 without change, there is no evidence that the net operating loss was correctly computed for that year or would have made a difference for that year. To be entitled to deduct the claimed net operating loss, petitioners would have to show that the losses were sustained and how much was offset against taxable income in earlier years. See sec. 172(b); Davis v. Commissioner, 674 F.2d 553 (6th Cir. 1982), affg. T.C. Memo. 1980-581; Jones v. Commissioner, 25 T.C. 1100 (1956), revd. and remanded on another issue 259 F.2d 300 (5th Cir. 1958); Egly v. Commissioner, T.C. Memo. 1988-223; Naegle v. Commissioner, T.C. Memo. 1965-212, affd. per curiam 378 F.2d 397 (9th Cir. 1967).

Additions to Tax and Penalties

Our discussion above concludes that petitioners are liable for the additions to tax and penalties for fraud for each year, and the alternative determinations with respect to negligence and delinquency are therefore moot.

Respondent also determined additions to tax under section 6661 for 1985 through 1988. Section 6661 imposes an addition to tax if there was a substantial understatement of income tax for any taxable year. There was a substantial understatement if the amount of the understatement exceeded the greater of (1) 10 percent of the tax required to be shown on the return for

the taxable year or (2) $5,000.  Sec. 6661(b)(1).  The amount of the understatement is reduced by the portion attributable to (1) the tax treatment of any item if there is or was substantial authority for such treatment or (2) any item with respect to which the relevant facts are adequately disclosed.  Sec. 6661(b)(2)(B).

The understatements of income tax for 1985 through 1988 were substantial.  No authority exists for petitioners' failure to report income.  Petitioners did not disclose any facts concerning the unreported items in their returns.  Petitioners are liable for the additions to tax under section 6661 for 1985 through 1987, and Mr. Gandy is liable for that addition to tax for 1988.

To reflect the above holdings,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.